United States Court of Appeals
For the First Circuit

No. 96-2368

GAIL MERCHANT IRVING,

Plaintiff, Appellee,

v.

UNITED STATES OF AMERICA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Torruella, Chief Judge,
Bownes, Senior Circuit Judge,
Selya, Boudin, Stahl, Lynch and Lipez, Circuit Judges.

Phyllis J. Pyles, Attorney, Torts Branch, Civil Division, with
whom Frank W. Hunger, Assistant Attorney General, Paul M. Gagnon,
United States Attorney, and Jeffrey Axelrad, Attorney, Torts
Branch, Civil Division, were on brief, for appellant.
Paul R. Cox, with whom Matthew B. Cox and Burns, Bryant,
Hinchey, Cox & Rockefeller, P.A. were on brief, for appellee.

OPINIONS EN BANC

December 18, 1998

SELYA, Circuit Judge. Almost two decades ago, Gail
Merchant Irving suffered horrific injuries in a workplace accident. 
She sued the United States under the Federal Tort Claims Act
(FTCA), 28 U.S.C. 1346(b), 2671-2680, claiming that inspectors
employed by the Occupational Safety and Health Administration
(OSHA) negligently performed their duties and thereby proximately
caused her injuries. The case traveled an inexcusably long and
tortuous route to a decision on the merits a route that included
four detours to this court. Ultimately, the district court,
proceeding under a legal framework established by a panel of this
court, concluded that the FTCA's discretionary function exception
did not bar the plaintiff's claim; that the OSHA inspectors had
acted negligently; and that such negligence was actionable under
applicable state law. See Irving v. United States, 942 F. Supp.
1483 (D.N.H. 1996) (Irving III). The court awarded the plaintiff
$1,000,000 in damages. See id. at 1502.
A divided panel of this court affirmed the judgment, seeIrving v. United States, 1998 WL 152941 (1st Cir. Apr. 8, 1998),
but the full court, acting sua sponte, withdrew the opinion and
ordered rehearing en banc, principally to review the important
question of whether the FTCA's discretionary function exception
foreclosed the plaintiff's negligent inspection claim. We now
answer that question in the affirmative.
I. BACKGROUND
Because the district court has faithfully chronicled the
tangled events that preceded this appeal, see Irving III, 942 F.
Supp. at 1485-98, we offer only a synopsis. We refer the reader
who hungers for greater detail to the district court's account.
In 1979, Somersworth Shoe Company operated a
manufacturing plant in New Hampshire. On October 10 of that year,
the plaintiff, a Somersworth Shoe employee, was stamping innersoles
by means of a marker machine. At one point, she went behind her
workbench to obtain materials from the die rack. In the process,
she dropped a glove. When she stooped to retrieve it, her hair was
drawn into the vacuum created by the high-speed rotation of a drive
shaft that delivered power to an adjacent "die-out" machine. She
sustained grievous injuries.
OSHA compliance officers twice had inspected the plant
(once in 1975 and again in 1978) under the auspices of OSHA's
authority to conduct general administrative inspections, but had
not noted any hazard in connection with the placement or guarding
of the die-out machine in the stock fitting room or the bench
assembly associated with it. Six days after Irving's mishap, OSHA
conducted an inspection focused on the accident and concluded that
the arrangement violated OSHA standards in three separate respects,
and that all three conditions were "serious." The most important
of these was the company's failure to guard the drive shaft
component of the die-out machine. See 29 C.F.R.
1910.219(c)(2)(ii) ("Shafting under bench machines shall be
enclosed by a stationary casing, or by a trough at sides and top or
sides and bottom, as location requires.").
After exhausting her administrative remedies, the
plaintiff invoked the FTCA and sued the United States in New
Hampshire's federal district court. She alleged that OSHA's
negligence in failing to note and cite the unguarded condition of
the drive shaft during the two pre-accident inspections proximately
caused her injuries. Had the OSHA compliance officers documented
the condition of the die-out machine, the plaintiff reasoned, her
employer would have taken corrective action and her injury would
not have occurred.
The United States moved to dismiss the suit on the ground
that the FTCA's discretionary function exception barred the
plaintiff's claim. The district court denied the motion. SeeIrving v. United States, 532 F. Supp. 840 (D.N.H. 1982). Trial
commenced on February 11, 1985, and ended three days later. The
district court took the matter under advisement, but did not act
for almost three years. At that point, the court reversed its
field and concluded that the discretionary function exception
applied after all. See Irving v. United States, No. Civ. C81-501-
SD, slip op. (D.N.H. Jan. 27, 1988) (unpublished). Accordingly, it
dismissed the case for lack of subject matter jurisdiction.
A panel of this court vacated the order of dismissal and
asked the district court to consider the impact of a newly decided
case, namely, Berkovitz v. United States, 486 U.S. 531 (1988). SeeIrving v. United States, 867 F.2d 606 (1st Cir. 1988) (table). The
district court determined that Berkovitz did not alter the result. 
See Irving v. United States, No. Civ. C81-501-SD, slip op. (D.N.H.
Feb. 14, 1989) (unpublished). The plaintiff again appealed.
A second panel of this court vacated the judgment. SeeIrving v. United States, 909 F.2d 598 (1st Cir. 1990) (Irving I). 
The panel recognized that, "[w]ere the statute and the formal
regulations the only standards guiding the compliance officer's
conduct, the discretionary function exception would apply." Id. at
603. But, the panel stated, even though these standards "give OSHA
wide freedom at higher agency levels to make decisions and
formulate programs," it "does not follow" that "an employee who
performs an inspection has the type and breadth of discretion which
makes the inspection a discretionary function." Id. The panel
thus concluded that further analysis and factfinding were required
to determine what OSHA policy actually required of OSHA compliance
officers engaged in inspection activities. See id. As a corollary
to this point, the panel noted that certain statements by OSHA's
area director and the individuals who conducted the earlier
inspections suggested that compliance officers may not have enjoyed
discretion over how thoroughly they were required to inspect a
plant. See id. at 604-05. Because these statements were
inconclusive, however, the panel remanded for further factfinding
to determine "whether OSHA policy left the thoroughness of
inspections a matter of choice for its compliance officers," and if
so, "whether the inspectors had policy-level discretion to fail to
note and tell the employer about the violation" which allegedly
caused plaintiff's injury. Id. at 605.
The district court pondered matters for four more years. 
Eventually, the judge, relying on a partial transcript of the 1985
trial, supplemented by his own notes, leapfrogged the discretionary
function exception entirely and decided the case on the merits,
concluding that the United States was not negligent because the
die-out machine's drive shaft was "guarded by location" at the time
of the inspections and, therefore, in full compliance with OSHA
regulations. Irving v. United States, No. Civ. C81-501-SD, 1994 WL
287750, at *3 (D.N.H. June 23, 1994). The plaintiff again
appealed.
A third panel of this court vacated the judgment,
discerning no basis for the "guarded by location" fact
determination. See Irving v. United States, 49 F.3d 830, 835-37
(1st Cir. 1995) (Irving II). The panel then addressed the
government's attempted resurrection of its discretionary function
defense and rejected it as foreclosed by the prior panel decision. 
See id. at 834 (noting that the panel did not feel "free to
revisit" the legal conclusions explicated in Irving I). In the
bargain, the panel dismissed the government's plaint that the
Supreme Court's intervening decision in United States v. Gaubert,
499 U.S. 315 (1991), made a decisive difference. See Irving II, 49
F.3d at 834-35.
At this juncture, a different trial judge assumed
responsibility for the case. Operating within the legal framework
erected by Irving I and reinforced by Irving II, the district court
concluded that, even though the applicable statute, regulations,
and written agency guidelines appeared to grant compliance officers
substantial discretion over how to conduct inspections, this
discretion was restricted "by less formal, but no less binding,
OSHA policy." Irving III, 942 F. Supp. at 1490-91. To determine
the parameters of this purported policy, the district court relied
exclusively on evidence adduced at the 1985 trial. It found that
the testimony of the compliance officers who had conducted the 1975
and 1978 inspections and the area director who was their superior
limned a policy that "required" OSHA's "wall-to-wall" inspections
to be "complete" in every respect. Id. at 1491. This, the
district court added, meant that OSHA inspectors were obligated to
examine "every operational machine and work station in the plant." 
Id. Finding that the inspectors had been negligent for not
examining and/or citing the die-out machine, the court held that
the United States was liable. See id. at 1505, 1510. This appeal
ensued.
II. PROCEDURAL ISSUES
Because this case comes before us in an anomalous
procedural posture, we begin by addressing a series of questions
related to the justiciability of the discretionary function issue.
A. Forfeiture.
When the United States instituted this appeal, it did not
ask the panel to reverse the district court's refusal to apply the
discretionary function exception. The plaintiff now seeks to
convince us that this omission precludes the en banc court from
considering the issue. We are not persuaded.
In the ordinary course, a party seeking to preserve a
point for review must present it seasonably in both the trial and
appellate courts and offer developed argumentation in support. 
See, e.g., United States v. Bongiorno, 106 F.3d 1027, 1034 (1st
Cir. 1997). Thus, a party who fails to raise a particular claim or
defense at a prior stage in the litigation normally forfeits the
right to assert it at a later stage. See National Ass'n of Soc.
Workers v. Harwood, 69 F.3d 622, 627-29 (1st Cir. 1995). But the
instant case does not fit this paradigm neatly. Even though the
United States did not hawk its basic discretionary function defense
the last time around, it did assert the defense at the very
beginning of this case and persistently raised it thereafter. It
was not until the final round of litigation that the government put
down those cudgels.
The United States had good reason not to press its basic
discretionary function point at that stage (either in the district
court or before the fourth appellate panel). In Irving I, a panel
of this court expressly defined the contours of the discretionary
function exception. 909 F.2d at 601-05. From then on, that
methodology represented both the law of the case and the law of
this circuit regarding the due application of the discretionary
function exception. The law of the circuit doctrine, as a general
matter, permits successor panels to revise prior panel decisions in
only two types of circumstances: (1) when supervening authority
(such as a newly enacted statute, an intervening opinion of the
Supreme Court, or a subsequent ruling of the en banc court)
directly requires such a step, or (2) when newly emergent
authority, though not controlling, offers a clear and convincing
reason to conclude that the earlier panel would have decided the
issue differently. See Williams v. Ashland Eng'g Co., 45 F.3d 588,
592 (1st Cir. 1995). Indeed, when the United States asserted the
discretionary function defense in Irving II, the panel not only
took refuge in the law of the circuit doctrine to dispense the
argument, but also rejected the government's importuning that the
Supreme Court's 1991 decision in Gaubert required a modification of
the prior circuit precedent. See Irving II, 49 F.3d at 834-35. 
Because two panels of this court had squarely rebuffed the
government's discretionary function defense, it is hardly
surprising that the government did not raise it anew in subsequent
proceedings before yet another (co-equal) panel of this court. SeeLouisiana-Pacific Corp. v. ASARCO, Inc., 24 F.3d 1565, 1583 (9th
Cir. 1994) (stating that raising a point on appeal that governing
state law foreclosed would have been "foolish," and excusing
waiver); see also United States v. London, 66 F.3d 1227, 1239-240
(1st Cir. 1995).
In sum, strong arguments can be made for not finding a
forfeiture here or, at least, for not strictly applying forfeiture
principles. Still, we need not definitively decide the point, for
there is a simple, clearcut answer to whether the question is
properly before us. After all, the discretionary function
exception to the FTCA implicates the federal courts' subject matter
jurisdiction. Federal courts, being courts of limited
jurisdiction, have an affirmative obligation to examine
jurisdictional concerns on their own initiative. See BIW Deceivedv. Local S6, Indus. Union of Marine & Shipbuilding Workers, 132
F.3d 824, 828 (1st Cir. 1997). Consequently, even if the
government failed properly to raise and preserve the discretionary
function defense a question on which we take no view we
nonetheless are bound to consider it. See Hydrogen Tech. Corp. v.
United States, 831 F.2d 1155, 1162 n.6 (1st Cir. 1987).
In her supplemental brief, the plaintiff puts a somewhat
different spin on the forfeiture argument. Citing a footnote in
the final district court opinion, she argues that the government
conceded the discretionary function question in that venue by
admitting that OSHA policy required its compliance officers to
"inspect every operation". Irving III, 942 F. Supp. at 1491 n.8. 
Waiver is, of course, a matter separate from forfeiture. SeeUnited States v. Olano, 507 U.S. 725, 733 (1993). Be that as it
may, we have reviewed the record with care and can find no such
concession. In any event, insofar as the plaintiff asserts that
the United States has conceded the discretionary function issue, we
note that parties do not possess the power to confer subject matter
jurisdiction on a federal court by concession. See United Statesv. Horn, 29 F.3d 754, 768 (1st Cir. 1994).
B. Power of the En Banc Court.
The procedural tangle in this case raises yet another
question: may an en banc court review issues decided by panels of
the court in prior appeals in the same litigation? We hold that
neither the law of the case doctrine nor the law of the circuit
doctrine disables an en banc court from overruling a panel decision
from a prior appeal in the same case. Accord Watkins v. United
States Army, 875 F.2d 699, 704-05 n.8 (9th Cir. 1989) (en banc);
Shimman v. International Union of Operating Eng'rs, Local 18, 744
F.2d 1226, 1229 n.3 (6th Cir. 1984) (en banc). The authority to
overrule the decision of a prior panel in the same case flows
logically from the error-correcting function of the full court. 
When a court sits en banc, the concern for adhering to a past
resolution of an issue in deference to settled expectations, which
underpins the doctrines of law of the case and law of the circuit,
must give way to the institutional interest in correcting a
precedent-setting error of great public import or a panel opinion
that conflicts with Supreme Court precedent. See United States v.
Rivera-Martinez, 931 F.2d 148, 151 (1st Cir. 1991) (noting that law
of the case doctrine does not apply when "controlling authority has
since made a contrary decision of the law applicable") (internal
quotes and citations omitted); see also Irving II, 49 F.3d at 834
(acknowledging that the law of the circuit rule would not apply in
the face of a contrary en banc opinion).
We are aware that the Eighth Circuit appears to have
suggested otherwise. See Robertson Oil Co. v. Phillips Petrol.
Co., 14 F.3d 373 (8th Cir. 1993) (en banc). The Robertson majority
held that the law of the case doctrine precluded it from revisiting
holdings from two earlier panel decisions because the full court
had denied contemporaneous suggestions for en banc rehearings after
the adjudication of both the first and second appeals. See id. at
376 n.5, 383, & n.13. We decline to follow Robertson for two
reasons. First, in this case, unlike in Robertson, the en banc
court was not invited to review any of the earlier panel decisions
on a contemporaneous basis, and thus, did not decline to do so. 
Second and more important to the extent that the Robertsonmajority's reasoning rests on mechanically applying the law of the
case doctrine to the decisions of earlier panels across the board,
it too narrowly cabins the proper purview of a court sitting en
banc. See id. at 386-88 (Beam, J., with whom Bowman and Loken,
JJ., join, dissenting).
Nor does the decision in Van Gemert v. Boeing Co., 590
F.2d 433 (2d Cir. 1978) (en banc), create an obstacle to en banc
review of a prior panel decision. There, the Second Circuit
suggested that the en banc court is free to overturn prior panel
decisions unless doing so would seriously and unfairly prejudice
the party that had benefitted from the earlier ruling. See id. at
436-37 n.9 (stating in dictum that "sitting en banc, we may
overrule any panel decision that a majority of the active judges
believes was wrongly decided, unless a party would be seriously
prejudiced as a result"). Even were we prepared to adopt this
formulation of the rule a matter which we leave for another day
it would not preclude us from reviewing the holdings of Irving Iand Irving II. As we have noted, the discretionary function
exception implicates the subject matter jurisdiction of federal
courts. Prejudice to a party, while always regrettable, cannot
furnish a viable rationale for overlooking a federal court's lack
of power to grant a remedy in the first place.
III. THE DISCRETIONARY FUNCTION EXCEPTION
Having cut a swath through the procedural thicket, we
turn to the government's discretionary function defense. In the
process, we afford plenary review to the question of whether the
discretionary function exception applies. See National Union Fire
Ins. v. United States, 115 F.3d 1415, 1417-18 (9th Cir. 1997),
cert. denied, 118 S. Ct. 1053 (1998); Fisher Bros. Sales, Inc. v.
United States, 46 F.3d 279, 282 (3d Cir. 1995) (en banc).
In the Court's words, "the basic inquiry concerning the
application of the discretionary function exception is whether the
challenged acts of a Government employee whatever his or her rank
are of the nature and quality that Congress intended to shield
from tort liability." United States v. S.A. Empresa de Viacao
Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 813 (1984). To
respond to this inquiry, we first must identify the conduct at
issue and then determine whether that conduct is discretionary. 
See Gaubert, 499 U.S. at 322. Even if this hurdle is cleared, the
discretionary function exception still does not attach unless the
exercise of discretion involves (or, at least, is susceptible to)
policy-related judgments. See id. at 322-23.
A. The Statutory and Regulatory Regime.

In this instance, the plaintiff claims that workplace
inspections, negligently performed by OSHA compliance officers,
proximately caused her injuries. In analyzing the nature of this
conduct, we begin with the language of the OSH Act because "it will
most often be true that the general aims and policies of the
controlling statute will be evident from its text," id. at 324,
and, in turn, these aims and policies will offer valuable insights
into the nature of the conduct.
In relevant part, the OSH Act authorizes the Secretary of
Labor to "inspect and investigate during regular working hours and
at other reasonable times, and within reasonable limits and in a
reasonable manner, any such place of employment and all pertinent
conditions, structures, machines, apparatus, devices, equipment,
and materials therein . . . ." 29 U.S.C. 657(a). Under this
authority, OSHA conducts both programmed general administrative
inspections known in the bureaucratic argot that OSHA so readily
attracts as "full-scope" or "wall-to-wall" inspections and more
focused efforts pinpointed to threats of imminent danger. Aside
from a reasonableness limitation on the time and manner of
inspections, the statute places virtually no constraint on the
Secretary's discretion to conduct such inspections in any way that
she deems fit. See Donovan v. Dewey, 452 U.S. 594, 601 (1981).
Comparison of this language to a parallel provision in
the Federal Mine Safety and Health Act (MSH Act), 30 U.S.C. 801
et seq., another health and safety statute administered by the
Secretary of Labor, strongly suggests that Congress's choice of
words was no accident. In defining the Secretary's
responsibilities regarding mine inspections, the MSH Act provides
that, in order to determine whether "an imminent danger exists" in
a mine and "whether there is compliance with the mandatory health
or safety standards or with a citation, order, or decision" issued
under applicable law, "the Secretary shall make inspections of each
underground coal or other mine in its entirety at least four times
a year, and of each surface coal or other mine in its entirety at
least two times a year." 30 U.S.C. 813(a) (emphasis supplied). 
For our purposes, the stark differences between the inspection
provisions of the MSH Act and those of the OSH Act are extremely
significant. Whereas Congress was careful to mandate comprehensive
inspections in the MSH Act, it left the scope and detail of OSH Act
inspections to the Secretary's discretion. Had Congress wished to
impose upon OSHA an obligation to inspect every corner of every
plant that it visited, we think it is highly likely that Congress
would have expressed its intention by choosing language comparable
to that which it used in crafting the MSH Act.
We recognize that, by its plain terms, the OSH Act
confers discretion only upon the Secretary, not upon compliance
officers and it is the latter's conduct that concerns us. 
Nevertheless, the legislative rules governing the authority of
compliance officers mimic the statute and grant these officials
broad discretion over the scope, manner, and detail of general
administrative inspections. The regulations' stated goal is "to
set forth general policies for enforcement of the inspection,
citation, and proposed penalty provisions of the Act." 29 C.F.R.
1903.1. Echoing the language of 29 U.S.C. 657(a), section
1903.3 of the regulations confers upon compliance officers the
unbridled power, subject only to limits of reasonableness, to enter
workplaces, inspect any piece of equipment or other pertinent item,
and interview any person in order to carry out the Secretary's
statutory mission. See 29 C.F.R. 1903.3(a).
To be sure, the regulations contain a sprinkling of
mandatory directives. See, e.g., id. at 1903.7 (obligating
compliance officers, inter alia, to present their credentials at
the start of an inspection, to use "reasonable precautions" when
taking photographs and samples, to wear appropriate protective
clothing, to avoid "unreasonable disruption" of the workplace, and
to "confer with the employer" in order to inform him of "any
apparent safety or health violations disclosed by the inspection"). 
Save for these and, for our purposes, other similarly innocuous
details, the regulations neither mandate a particular modusoperandi for conducting inspections nor otherwise materially
restrict compliance officers' flexibility. Of particular
importance, the regulations do not prescribe any specific regimen
governing the scope or detail of general administrative inspections
performed by compliance officers.
B. The Nature of the Action.
Under the jurisprudence of the FTCA, a function is non-
discretionary only when a "federal statute, regulation, or policy
specifically prescribes a course of action for an employee to
follow." Gaubert, 499 U.S. at 322 (quoting Berkovitz, 486 U.S. at
536); accord Williams v. United States, 50 F.3d 299, 309-10 (4th
Cir. 1995) (applying discretionary function bar because applicable
regulations did not mandate a specific course of action for agent
to follow when engaging managerial and custodial services); Laytonv. United States, 984 F.2d 1496, 1502-03 (8th Cir. 1993) (holding
that, in the absence of specific guidelines, the manner of
inspection is a matter of discretion, and distinguishing situations
"in which [a] government inspector is controlled by precise
regulations establishing specific steps he is required to perform
in his inspections"); Cooper v. American Auto. Ins. Co., 978 F.2d
602, 612 (10th Cir. 1992) (holding that discretionary function
exception bars negligent investigation claim absent any statute or
"regulation mandating particular inquiries to be made or methods of
making them"). Given the considerable leeway afforded to
compliance officers under the statutory and regulatory mosaic,
general administrative inspections conducted by OSHA compliance
officers would seem to fit comfortably within the discretionary
function exception. Indeed, two of our sister circuits have so
held, see Judy v. United States, 864 F.2d 83, 84 (8th Cir. 1988);
Galvin v. OSHA, 860 F.2d 181, 184 (5th Cir. 1988), and none has
demurred.
The Irving I panel, though clearly recognizing the
discretionary nature of the authority granted by the statute and
regulations, 909 F.2d at 603, nevertheless held that a further
factual inquiry was needed to ascertain whether some less formal
protocol "left the compliance officers with no policy-level
discretion," id. at 603. We now reject the panel's predictive
analysis.
To begin with, the Irving I panel appears to have
accepted the plaintiff's position that, because the 1975 and 1978
inspections were "general inspections," the compliance officers'
conduct was not discretionary. This conclusion suggests that the
panel further assumed that general administrative inspections fall
outside the scope of 29 U.S.C. 657(a) and 29 C.F.R. 1903.7. 
See Irving I, 909 F.2d at 603. We cannot accept this construct. 
As our explication of the statute and regulations demonstrates, seesupra Part III(A), general administrative inspections are conducted
under the auspices of section 657(a). The relevant regulations,
moreover, explicitly grant compliance officers the same broad
discretion enjoyed by the Secretary with respect to such
inspections. Had the Irving I court not overlooked this important
fact, its own logic quite likely would have led it to hold, as we
do today, that the discretionary function defense prevails. SeeIrving I, 909 F.2d at 603 (acknowledging that the statute and
regulations, considered alone, appear to confer discretion for
covered inspections, but questioning whether they governed the
actions of compliance officers).
This error materially altered the decisional calculus. 
Because the Irving I panel misconstrued the applicability of the
regulations to the conduct of compliance officers, it failed
properly to consider when a court might justifiably consult
informal policy statements in order to shed light on whether an act
is discretionary. Of course, as Irving I suggests, informal agency
rules and similar pronouncements may at times bind agency personnel
for the purposes of discretionary function exception analysis. SeeGaubert, 499 U.S. at 324. Hence, courts may consult such sources
in appropriate cases to determine whether a particular function is
(or is not) discretionary. See, e.g., Domme v. United States, 61
F.3d 787, 791 (10th Cir. 1995) (applying discretionary function bar
when none of the relevant statutes, regulations, or internal agency
guidelines specified the "precise manner" in which the Department
of Energy was to conduct safety appraisals); Autery v. United
States, 992 F.2d 1523, 1529 (11th Cir. 1993) (similar, re park
inspections). Occasionally, such an informal policy will tip the
scales. See McMichael v. United States, 856 F.2d 1026, 1033-34
(8th Cir. 1988) (holding that when internal agency guidelines
directed government inspectors to follow a detailed regime,
discretionary function exception did not apply). Still,
recognizing that informal sources sometimes may assist courts in
deciding whether a function is discretionary is one thing;
synthesizing when and how they may do so is another.
Gaubert itself provides some clues as to when courts
ought to consult informal rules. There, the Justices indicated
that such rules become significant to the discretionary function
analysis when an agency promulgates "regulations on some topics,
but not on others," or when it relies on "internal guidelines
rather than on published regulations" to govern official conduct. 
Gaubert, 499 U.S. at 324. The Court contrasted these situations
with those in which agencies announced policy mainly through
rulemaking and/or adjudication. See id. Thus, if an agency
establishes policy primarily by promulgating legislative rules, and
if those legislative rules unambiguously define the nature of the
challenged conduct, the discretionary function inquiry is at an
end.
Of course, this formulation requires that the legislative
rules be unambiguous and that they define the proper level of
conduct. We can well imagine that resort to informal indicia may
be justified either when an agency's legislative rules define the
conduct of some employees, but not others (e.g., when the
regulations define the conduct of a regional official but not of a
subordinate whose negligence is alleged to have caused the
plaintiff's injury), or when legislative rules create ambiguity
(e.g., when the regulations interweave precatory with quasi-
mandatory language, as in Kelly v. United States, 924 F.2d 355,
360-61 (1st Cir. 1991)). This case, however, involves neither of
these circumstances, nor does it involve any other fairly
comparable situation. Here, the regulations flow rationally from
the enabling statute, directly address the level of conduct at
issue, and unambiguously grant OSHA compliance officers discretion
over the scope, manner, and details of conducting inspections. 
Where, as here, the statute and the applicable regulations clearly
speak to the nature of the conduct, there is no occasion to consult
informal rules.
In this case, moreover, our conclusion would remain
unaffected even were we obliged to go beyond formal sources, for,
as the regulations adumbrate, OSHA's informal rules point
unerringly in the same direction. At the relevant time, OSHA
published (and still publishes) a field operations manual (the
Manual), which is a compilation of agency guidelines. These
guidelines are intended to limn the agency's operating procedures. 
The Manual devotes an entire chapter to describing "General
Inspection Procedures." Discussing the responsibilities of
compliance officers, this chapter states in pertinent part:
The conduct of effective inspections requires
identification, professional evaluation, and
accurate reporting of safety and health
conditions and practices. Inspections may
vary considerably in scope and detail,
depending upon the circumstances of each case.

From that point forward, the chapter essentially mirrors the
requirements set forth in the regulations. Importantly, the Manual
contains no specific prescription mandating OSHA inspectors to
proceed item by item or to cover every nook and cranny of a
facility during a general administrative inspection. Consequently,
even if it were necessary to consult informal rules in this
instance and we stress that it is not those rules place the
compliance officers' actions squarely in the maw of the
discretionary function exception.
Of course, the Irving I panel directed the district court
to determine OSHA policy by looking beyond the clear statements in
the statute, the regulations, and the agency's internal guidelines. 
909 F.2d at 603-05. In the circumstances of this case, that
directive should not have issued. The Gaubert Court instructed
inferior courts to look to the requirements set forth by
"established governmental policy" in mounting a discretionary
function inquiry. Gaubert, 499 U.S. at 324 (emphasis supplied).
The Court specifically identified only statutes,
regulations, and agency guidelines as competent sources for
determining government policy. See id. Although we do not suggest
that those items invariably will be the exclusive sources for
determining established policy, it bears remembering that the
Court's recognition that informal rules may be a relevant source
took place against a background understanding, both in
administrative law generally and in the OSHA context specifically,
that agencies typically make authoritative informal statements of
policy positions through published interpretive rules or
enforcement guidelines. See Martin v. OSHRC, 499 U.S. 144, 157
(1991). Although anecdotal testimony sometimes may furnish clues
regarding the nature of agency policy, it is usually a last-ditch
resort. See Kenneth C. Davis & Richard J. Pierce, Jr., 3
Administrative Law Treatise 17.3, at 108 (3d ed. 1994) (placing
unwritten rules and "officer's habit" at the bottom of a list of
twelve sources, headed by "legislative rules," and including
interpretative rules, published guidelines, published policy
statements, orders, and written but unpublished guidelines, and
noting that the power to limit officer discretion decreases "as the
reader proceeds down the list").
The most obvious reason why such sources command less
weight is because it matters who speaks. To determine what is
agency policy, courts customarily defer to the statements of the
official policymaker, not others, even though the others may occupy
important agency positions. See Martin, 499 U.S. at 152-53; seealso Director, OWCP v. Eastern Associated Coal Corp., 54 F.3d 141,
147 (3d Cir. 1995). This case is a suitable vehicle for
application of the principle. Congress has the legal authority to
render a function either discretionary or obligatory, and it has
delegated that power to the Secretary, not to OSHA's area directors
or compliance officers. Hence, we decline to accord decretory
significance to the area director's or compliance officers'
thoughts on OSHA policy requirements, especially when the plaintiff
insists on interpreting this testimony in a manner contrary to both
the express statements of Congress and the agency's institutional
pronouncements. Accord Valdez v. United States, 56 F.3d 1177,
1179-180 (9th Cir. 1995) (refusing to credit agency employees'
testimony that agency rules were mandatory when plain text of
guidelines belied that interpretation; concluding, moreover, that
discretionary function exception barred action).
We add a coda. As the Irving I panel itself intimated,
909 F.2d at 604-05, the trial testimony does not unequivocally
establish that OSHA imposed on its officers a mandatory duty of
inspecting every piece of equipment in a workplace. Rather, the
testimony on which the plaintiff relies (and upon which the
district court premised its holding) is at best ambiguous and
this erodes any conceivable legitimacy that it otherwise may have
had as an expression of agency policy. Thus, even setting aside
the statute, regulations, and Manual, we do not believe that any
statement in the trial record suffices to support the plaintiff's
theory that OSHA had a policy of exhaustively inspecting every
machine.
By way of illustration, consider the following exchange,
which is perhaps the plaintiff's best evidence, between her counsel
and OSHA's area director, F. Richard Amirault:
Q. And, by the way, the obligation
and procedure of your department
is to note and cite specific
violations, is it not? 

A. To note document and 
identify and document specific
hazards, yes. 

Q. Machine by machine by machine?

A. As far as we can see. 

Q. Hazard by hazard by hazard?

A. As can be observed.

To begin with, the passage is internally ambiguous in at least one
critical way. Given the tenor of Amirault's answers, it can be
construed to mean that inspectors were obligated to note and
document every hazard that they saw associated with the machines
that they in fact inspected. At no point did Amirault state,
directly or by necessary implication, that there was a policy to
look at every machine.
Furthermore, even if we interpret this passage favorably
to the plaintiff, it is inadequate as a matter of law to support
the plaintiff's position. Where, as here, the express statements
of Congress and the agency occupy the field, trial testimony by a
witness must, if it is to carry any weight, somehow reconcile the
witness's understanding of policy with that authority. At the very
least, there must be an indication in the record that the witness
demonstrated his awareness of the agency's formal policy
statements, but nevertheless had some other articulable basis that
supported his understanding of agency policy.
In the absence of such evidence, the most that is
suggested by a passage such as the one quoted above is that the
OSHA area director and the compliance officers who inspected the
Somersworth Shoe plant subjectively exercised, or intended to
exercise, the discretion conferred upon them by law in a particular
manner, or, alternatively, that they were unaware of the existence
of such discretion. We know from Gaubert that the subjective
intent of an agency actor is irrelevant to conducting a
discretionary function analysis. See Gaubert, 499 U.S. at 325. 
Rather, the focus of the inquiry is on "the nature of the actions
taken and on whether they are susceptible to policy analysis." Id. 
The OSHA officers' ambiguous testimony in this case is by itself
insufficient to alter the nature of the actions as defined by
authoritative formal and informal sources.
There are also passages in the trial record where
Amirault refers to OSHA guidelines. This testimony further
undermines the plaintiff's theory. For example, when plaintiff's
counsel asked Amirault about the Manual, Amirault responded that it
was OSHA's "procedural bible" and, as such, described his staff's
"operating procedure." He unequivocally stated that inspections
were conducted pursuant to directions set forth by the Manual:
Q. So that for any general or
regular inspection at least they
[i.e., the compliance officers]
would simply follow the manual
and the objective standards of
OSHA?

A. Right. Following the manual,
the FOM, Field Operations
Manual.

This cinches the matter, for, as we have already noted, the Manual
provides no support for the plaintiff's theory.
Our conclusion is further confirmed by other statements
made by Amirault. Consider, for instance, the following exchange:
Q. And those programmed
inspections, as I understand it,
would be your random way of just
doing spot checks on an entire
plant without advance notice?

A. Yes, that's correct.

Q. And those are the type of
inspections that your agency
performed on the Somersworth
plant in 1975 and 1978?

A. Yes.

Q. We've learned through the
depositions that those two
inspections were what is known
as a wall-to-wall inspection, is
that correct?

A. I'm going to say yes.

Q. And in such an instance, when
one of your safety men goes to a
plant, he would spend the whole
day or whatever time was
necessary to inspect the entire
plant for safety hazards. 

A. He would be able to walk
through, yes.

Read naturally, this passage indicates that general administrative
inspections constitute nothing more than "walk throughs" that
involve random spot checks. As such, it flatly contradicts the
suggestion that the inspectors "could not choose simply to spot
check certain areas," Irving I, 909 F.2d at 604, and it places the
inspection scheme squarely within the Varig Airlines regime. On
any reading, the passage does not come close to establishing that
OSHA had a strict policy of requiring inspectors to look in detail
at every machine.
C. Policy-Based Discretion.
Having confirmed the existence of discretion on the
compliance officers' part, what remains is to examine whether that
discretion is grounded in policy a question that none of the
prior panels reached. We believe that it is.
The plaintiff contends that the discretionary function
defense is doomed because the United States failed to adduce any
evidence to support the proposition that OSHA inspectors' actions
are grounded in policy. This argument lacks force. When a
function is discretionary, there is a presumption that "the agent's
acts are grounded in policy when exercising that discretion." 
Gaubert, 499 U.S. at 324. Hence, the United States has no burden
of production; it may rest, as it did here, on the Gaubertpresumption.
The plaintiff next endeavors to overcome the Gaubertpresumption by pointing to trial testimony by OSHA employees and
noting that they purportedly failed to articulate policy
justifications for their actions. But Gaubert requires only that
a government agent's actions be "susceptible" to policy analysis,
and insists that courts must disregard analyses that rely on
subjective intent to determine whether a discretionary choice is
policy-driven. See id. at 325. Because the plaintiff offers no
concrete challenge to the position that OSHA compliance officers'
actions are policy-driven, the Gaubert presumption remains intact.
Even beyond the presumption, we believe that the
discretion granted to OSHA inspectors is deeply rooted in policy
considerations. The OSH Act's purpose is to provide for a
satisfactory standard of safety, not to guarantee absolute safety. 
See Industrial Union Dep't v. American Petroleum Inst., 448 U.S.
607, 646 (1980) (plurality opinion) (discussing legislative
history); Donovan v. General Motors Corp., 764 F.2d 32, 35-36 (1st
Cir. 1985) (same); cf. Union of Concerned Scientists v. NRC, 824
F.2d 108, 118 (D.C. Cir. 1987) (citing Industrial Union and
stating, in the context of nuclear regulation, that an "adequate
protection" standard "need not, and almost certainly will not" be
a level of "zero risk"). A corollary to this observation is that
OSHA may legitimately devote its limited enforcement resources to
monitoring workplaces and working conditions that pose the most
serious threats to worker health and safety. OSHA has done so in
part, for example, by adopting inspection priorities and an
administrative plan to govern programmed general inspections. See,
e.g., Industrial Steel Prods. Co. v. OSHA, 845 F.2d 1330, 1333-34
(5th Cir. 1988) (describing OSHA site selection criteria for
programmed inspections).
The function of an OSHA compliance officer is an integral
part of OSHA's enforcement policies. When conducting inspections
under the auspices of an administrative plan, OSHA compliance
officers are expected to study the layout of the facility they are
about to investigate, to review its health and safety records, and
to interview employer and employee representatives during the
inspection about working conditions. One might expect that as a
result of such study, OSHA inspectors will make daily judgments
about what risks and safety issues most urgently require their
attention. At bottom, OSHA inspectors must visit numerous
workplaces, all of which present different challenges and issues,
and they simply cannot be expected to inspect every item in every
plant. The day-to-day decisions made by compliance officers thus
further OSHA's enforcement policy of ensuring adequate safety in
workplaces with a view toward efficient and effective use of
limited enforcement resources, and are thus grounded in policy. 
Cf. Gaubert, 499 U.S. at 331-33 (explaining that day-to-day
decisions of thrift regulators were grounded in policies underlying
thrift regulation statutes).
We are not persuaded by the plaintiff's contention that
all inspections ought to be painstakingly comprehensive because
individual companies rely on OSHA inspections to improve their
health and safety conditions. The OSH Act, in no uncertain terms,
places primary responsibility for workplace safety on employers,
not on the federal government. See 29 U.S.C. 654(a); Reich v.
Simpson, Gumpertz & Heger, Inc., 3 F.3d 1, 4 (1st Cir. 1993).

IV. CONCLUSION
This case has disturbing aspects. The government's
inspectors appear to have been negligent and the plaintiff suffered
grievous harm. Arrayed in opposition, however, is the core policy
that underlies the discretionary function exception: an abiding
concern about exposing the government to far-flung liability for
action (or inaction) in situations in which it has reserved to its
own officials the decision about whether or not to act. Even if
the decision may seem wrong in retrospect, or if its implementation
is negligent, such decisionmaking by its nature typically requires
a balancing of interests (e.g., how to deploy scarce government
resources in the accomplishment of worthwhile but expensive 
public needs). Congress reasonably struck this balance by
requiring that, ordinarily, liability will not inhere absent an
authoritative decision that a specific act should become a
governmental responsibility. Under this model, the random and
uncodified practices of a local supervisor cannot create the kind
of specific obligation that gives rise to liability. Were the law
otherwise, there would be scant likelihood of precision or
uniformity, and local supervisors would have a perverse incentive
to refrain from laying down any rules at all.
We need go no further. Even though exceptions to the
FTCA's waiver of sovereign immunity are construed narrowly, they
are not to be ignored. Here, Congress clearly expressed its intent
through unequivocal statutory language, and the Secretary of Labor,
as Congress's delegate, adopted legislative rules which faithfully
adhere to that monition. The statute and regulations, fairly read,
bring the case within the compass of the FTCA's discretionary
function exception, and the agency's internal guidelines buttress
this positioning. Accordingly, we must grant the government the
immunity that Congress envisioned. We regret only the plaintiff's
unfortunate accident and the added suffering she has endured due to
the inordinate delay and erratic decisionmaking that spawned two
decades of needlessly protracted litigation.

Reversed. No costs.

Separate Opinions Follow STAHL, Circuit Judge, (concurring). Despite strong
reservations, I joined the withdrawn panel opinion, see Irving v.
United States, 1998 WL 152941 (1st Cir. Apr. 8, 1998), because I was
then bound by the interpretation of the discretionary function
exception set forth in Irving v. United States, 909 F.2d 598 (1stCir. 1990) (Irving I). Having endorsed the decision of the en banccourt to revisit Irving I, I now concur in the view, ably stated in
Judge Selya's majority opinion, that the discretionary function
exception forecloses plaintiff's negligent inspection claim. 
Although the issue is close and no Supreme Court case is directly
on point, I do not believe that, in a regulatory context that is so
obviously discretionary, Congress would intend to make actionable
under the FTCA an ignored instruction from a superior to a
subordinate that the subordinate perform a function that is
otherwise discretionary (for policy-based reasons). To my mind, an
ignored instruction of this sort is better conceptualized as an
abuse of the discretion conferred by the regulatory regime. Such
abuses of discretion are not within the reach of the statute. See28 U.S.C. 2680(a). BOWNES, Senior Circuit Judge, with whom LIPEZ, Circuit
Judge, joins (dissenting). The majority opinion fundamentally
misconstrues controlling Supreme Court precedent in analyzing the
discretionary function exception to the Federal Tort Claims Act
("FTCA"). The majority is concerned that permitting Irving's claim
to succeed would undermine OSHA's broad discretion in deciding how
to implement its enforcement policy. No one disputes that the
agency as a whole retains considerable discretion. The problem is
that the majority undertakes its analysis from the wrong vantage
point. 
As the Supreme Court has made clear, the appropriate
focus is the degree of choice that was in fact available, not to
the agency as a whole but to the specific "acting employee" whose
conduct is the basis for the tort action. Berkovitz v. United
States, 486 U.S. 531, 536 (1988). The discretionary function
exception shields the government from lawsuits challenging
governmental action only if that specific action was based on
discretion grounded in policy. See id. The exception was intended
to protect only such specific policy-based judgment. The present
case involves no second-guessing of protected policy-making.
A parallel problem is the majority's mischaracterization
of Gail Irving's position. Irving does not contend "that all
[OSHA] inspections ought to be painstakingly comprehensive." Maj.
Op. at 34. Her claim, properly construed, is that once inspectors
have been ordered by their supervisor to perform a wall-to-wall
inspection, they must do so with due care. Irving argues that if
the inspectors had followed their superiors' orders, she would not
have had her scalp torn from her head. Thus, she contends that the
negligent inspections were not protected by the discretionary
function exception because the inspectors had "no rightful option
but to adhere to the directive" of their superior officer. SeeBerkovitz, 486 U.S. at 536.
Because in my view the district court properly concluded
that the exception does not bar Irving's claim, I respectfully
dissent. I
The FTCA, except for certain enumerated exceptions,
"waives the Government's immunity from suit in sweeping language." 
Smith v. United States, 507 U.S. 197, 205 n.1 (1993) (quoting
United States v. Yellow Cab Co., 340 U.S. 543, 547 (1951)). The
FTCA authorizes suits against the United States for damages
for . . . personal injury or death caused by
the negligent or wrongful act or omission of
any employee of the Government while acting
within the scope of his office or employment,
under circumstances where the United States,
if a private person, would be liable to the
claimant under the law of the place where the
act or omission occurred.

28 U.S.C. 1346(b). The FTCA is a "broad waiver of sovereign
immunity," which "generally authorizes suits against the United
States for damages" that fit within its description. Berkovitz,
486 U.S. at 535. This waiver applies unless the government is
protected by one of several specifically enumerated exceptions to
the FTCA. Id.; see 28 U.S.C. 2680. 
The majority opinion relies upon the discretionary
function exception, which provides that no liability shall lie for
"[a]ny claim . . . based upon the exercise or performance or the
failure to exercise or perform a discretionary function or duty on
the part of a federal agency or an employee of the Government,
whether or not the discretion involved be abused." 28 U.S.C.
2680(a).
Congress's purpose in enacting the discretionary function
exception was to "prevent judicial 'second-guessing' of legislative
and administrative decisions grounded in social, economic, and
political policy through the medium of an action in tort." United
States v. Varig Airlines, 467 U.S. 797, 814 (1984); see alsoBerkovitz, 486 U.S. at 539. Thus, the exception was designed to
protect government agents' exercise of policy-based discretion, to
prevent individual government agents from having to look over their
shoulders worrying about a potential lawsuit when they are truly
exercising policy-based discretion.
The same protective rationale does not apply when
government agents are merely carrying out mandatory directives,
whatever the basis of those mandatory orders. If a government
employee has no choice about how to act whether because a
statute, regulation, or agency policy mandates particular actions
for all such employees, or for whatever other reason (here, because
his supervisor explicitly ordered him to conduct a wall-to-wall
inspection) then "there is no discretion in the conduct for the
discretionary function exception to protect." Berkovitz, 486 U.S.
at 536.
Thus, the Court has set forth a two-prong test to
determine whether the discretionary function exception applies. 
First, the acting government employee must be exercising
discretion, when he engages in the challenged conduct. And second,
even when government agents are exercising discretion, their
conduct is immune from tort suits only when that discretion is
based on policy. The exception "protects only governmental actions
and decisions based on considerations of public policy." Id. at
537.
II
The majority misses an important part of the Supreme
Court's analysis of the discretionary function exception: from
what vantage point should the court view the conduct of government
agents? In this case, what level of OSHA employees is the proper
focus for our attention? "The proper question to ask is not
whether the Government as a whole had discretion at any point, but
whether its allegedly negligent agents did in each instance." In
re The Glacier Bay, 71 F.3d 1447, 1451 (9th Cir. 1995). Instead,
the majority focuses on the discretion of the agency as a whole, at
the command level. This fundamental misconception of the
discretionary function exception infects the majority's entire
analysis. It leads the majority to misunderstand Irving's claim
and to misapply the law governing the discretionary function
exception.
A
Section 2680(a) refers to two different types of
discretion: (1) the "performance . . . [of] a discretionary
function or duty on the part of a federal agency" and (2) such
"performance . . . on the part of . . . an employee of the
Government." The majority's analysis centers on the first type. 
Citing both the statute and the regulations, it emphasizes that the
agency as a whole had discretion in carrying out its statutory
inspection functions. Of course it did. If the plaintiff had
challenged OSHA's hypothetical decision to conduct inspections upon
only a random sample of factories, or a supervisor's decision to
omit Somersworth Shoe from that sample, or an order that the
inspectors conduct only a spot check and not a wall-to-wall
inspection of Somersworth Shoe, then I would agree with the
majority that her claim must be dismissed based on the
discretionary function exception. If Amirault did not have the authority to order a wall-to-wall inspection, e.g., because
the statute or regs precluded him from doing so, then his order would be ultra vires and
Irving could not rely on it. 
But that is merely the first type of discretion addressed
in 2680(a) ("performance . . . [of] a discretionary function or
duty on the part of a federal agency"). The plain language of the
statute requires a distinction between this type of discretion and
the second type: "performance [of] . . . a discretionary function
or duty on the part of . . . an employee of the Government." 28
U.S.C. 2680(a). The latter is the focus of Irving's complaint.
Here, OSHA exercised its discretion, at the command level
of the agency, about how to allocate its scarce resources. It
delegated to each area office a certain amount of discretion to
conduct various types of inspections. Pursuant to that delegation,
as Irving alleged and the district court found, the area office
here decided to deploy its inspection resources by calling for less
than complete inspections of some factories but, in the case of
Somersworth Shoe, by requiring wall-to-wall inspections of its New
Hampshire plant. The area director instructed two members of his
staff, inspectors Chase and Ritchie, to examine every machine in
the plant. Irving v. United States, 942 F. Supp. 1483, 1491 & n.8
(D.N.H. 1996).
Thus, the agency's discretionary policy decisions were
completed as soon as the area director made his "wall-to-wall"
decision; the agency had committed itself to this undertaking,
before the inspectors set foot on the premises of Somersworth Shoe. 
It was after these discretionary policy decisions had been
completed that the inspectors negligently executed the agency's
policy, giving rise to the injuries suffered by the plaintiff. At
that point, Chase and Ritchie, the inspectors, had "no rightful
option but to adhere to the directive" from their supervisor and
examine every machine in the plant. Berkovitz, 486 U.S. at 536. 
The conduct of Chase and Ritchie "cannot appropriately be the
product of judgment or choice, [so] there is no discretion in
[their] conduct for the discretionary function exception to
protect." Id.

B
The plain language of the statute is only one reason why
the majority is wrong to focus only on the upper levels of the
agency rather than the inspectors whose actions Irving is
challenging for determining whether the discretionary function
exception applies. Controlling Supreme Court precedent likewise
demonstrates the majority's error. The principal Supreme Court
case explicating the discretionary function exception is Berkovitzv. United States, 486 U.S. 531 (1988). 
The Court's opinion exposes the majority's error in three
different ways: (1) in the Court's analysis of the discretionary
function exception, (2) in the Court's discussion of prior Supreme
Court precedent, to harmonize those cases with the Berkovitzanalysis, and (3) in the Court's application of its legal analysis
to the facts of Berkovitz's claims. Because of the importance of
the Berkovitz case, and because this court is duty-bound to
faithfully apply Supreme Court precedent, I will discuss each of
these in some detail.
1
The Berkovitz Court set forth clearly the mode of
analysis that we should employ in cases such as this:
The determination of whether the discretionary
function exception bars a suit against the
Government is guided by several established
principles. This Court stated in Varig that
"it is the nature of the conduct, rather than
the status of the actor, that governs whether
the discretionary function exception applies
in a given case." In examining the nature of
the challenged conduct, a court must first
consider whether the action is a matter of
choice for the acting employee. This inquiry
is mandated by the language of the exception;
conduct cannot be discretionary unless it
involves an element of judgment or choice. 

Id. at 536 (citation omitted) (emphasis added). 
The Court's methodology, which was plainly not followed
by the majority in this case, requires that we ask what "conduct"
is "challenged" by the plaintiff in the particular case, determine
which employee in the agency has engaged in that conduct, and then
consider "whether the action is a matter of choice for the acting
employee." Id. 
The Court's focus on "the acting employee" is equally
plain from the next passage of Berkovitz:
[T]he discretionary function exception will
not apply when a federal statute, regulation,
or policy specifically prescribes a course of
action for an employee to follow. In this
event, the employee has no rightful option but
to adhere to the directive. And if the
employee's conduct cannot appropriately be the
product of judgment or choice, then there is
no discretion in the conduct for the
discretionary function exception to protect. 
Cf. Westfall v. Erwin, 484 U.S. 292, 296-97
(1988) (recognizing that conduct that is not
the product of independent judgment will be
unaffected by threat of liability).

Id. (citation omitted; emphasis added). 
The Court could not have been more clear that, when we
examine whether there is "discretion in the [challenged] conduct
for the discretionary function exception to protect," we must focus
on the individual employee whose "conduct" is "challenged" by the
plaintiff. Here, that is Chase and Ritchie. The challenged
conduct is their failure to inspect the die-out machine that
injured Irving, despite having been ordered by their supervisor to
inspect every machine. Where, as here, the acting employee has
been ordered by his supervisor to proceed in a certain manner, and
the plaintiff is seeking recompense for injuries resulting from
that employee's failure properly to follow that command, then it is
irrelevant that "the statute places virtually no constraint on the
Secretary's discretion to conduct such inspections in any way that
she deems fit," maj. op. at 17, or that OSHA's generally applicable
"rules governing the authority of compliance officers mimic the
statute and grant these officials broad discretion over the scope,
manner, and detail of general administrative inspections," id. at
18.
Of course the Secretary and her top assistants have broad
discretion in managing the agency's enforcement enterprise, as do
any subordinate officials to whom that discretion is properly
delegated. But this does not mean that front-line inspectors have
any discretion once decisions have been made by their superiors in
the hierarchy and a mandatory directive has been given to the
inspectors.
The Court in Berkovitz moved on to the second prong of
its analysis: even "assuming the challenged conduct involves an
element of judgment," was that judgment based on policy? There,
too, the Court looked at this question at the level of the
individual whose actions are challenged by the plaintiff in the
case at hand: "The exception, properly construed, . . . protects
only governmental actions and decisions based on considerations of
public policy. In sum, the discretionary function exception
insulates the Government from liability if the action challenged in
the case involves the permissible exercise of policy judgment." 
Berkovitz, 486 U.S. at 537 (citation omitted; emphasis added). 
Again, the focus is on the particular "action challenged in the
case" the shoddy inspection by Chase and Ritchie and not on
whether the agency as a whole or even a supervisor like Amirault
"exercise[s] . . . policy judgment." See id.; In re The Glacier
Bay, 71 F.3d at 1451.
2
The Berkovitz Court next discussed prior Supreme Court
precedent, to demonstrate how those prior decisions fit into the
Court's analytical framework. This discussion again stresses the
importance of keeping the analysis focused at the level of the
acting government employee.
The Court first analyzed the actions challenged in Varig
Airlines, namely, the FAA's negligence in certifying certain
airplanes for operation, including its decision to certify the
airplanes without first inspecting them. 
Congress had given the Secretary of
Transportation broad authority to establish
and implement a program for enforcing
compliance with airplane safety standards. In
the exercise of that authority, the FAA, as
the Secretary's designee, had devised a system
of "spot-checking" airplanes for compliance. 
Th[e Supreme] Court first held that the
establishment of that system was a
discretionary function within the meaning of
the FTCA because it represented a policy
determination as to how best to "accommodat[e]
the goal of air transportation safety and the
reality of finite agency resources."

Berkovitz, 486 U.S. at 537 (quoting Varig Airlines, 467 U.S. at
820). Applying this portion of the analysis to the present case,
OSHA's broad discretion in devising its methodology for conducting
inspections, whether "spot-checking" or some other method, is
protected under the discretionary function exception.
But the Court's analysis did not end there. Varig
Airlines also held that the discretionary function exception
protected "the acts of FAA employees in executing the 'spot-check'
program," because under this program the employees "were
specifically empowered to make policy judgments regarding the
degree of confidence that might reasonably be placed in a given
manufacturer, the need to maximize compliance with FAA regulations,
and the efficient allocation of agency resources." Varig Airlines,
467 U.S. at 820. The Berkovitz Court added the following
explanation: "Thus, the Court [in Varig Airlines] held the
challenged acts protected from liability because they were within
the range of choice accorded by federal policy and law and were the
results of policy determinations." Berkovitz, 486 U.S. at 538
(emphasis added).
This second set of actions executing the "spot-check"
program is not analogous to the Irving situation. The crucial
distinction is that Varig's spot-check protocol left the FAA's
line-level employees with a "range of choice" based on "policy"
judgments. In contrast, the OSHA inspectors in Irving were not
executing a "spot-check" protocol; they were specifically ordered
by their superiors to inspect every machine. They thus had zero
"range of choice." Berkovitz, 486 U.S. at 538. They had no
discretion, whether based on policy judgment or otherwise, to
decide unilaterally during their inspection of the Somersworth
plant not to inspect the die-out machine that caused Irving's
injuries. These inspectors' shoddy execution does not involve "the
necessary element of choice," grounded in policy, United States v.
Gaubert, 499 U.S. 315, 323 (1991), that the discretionary function
exception was intended to protect.
Berkovitz also analyzed Indian Towing Co. v. United
States, 350 U.S. 61 (1955), as "illuminat[ing] the appropriate
scope of the discretionary function exception." Berkovitz, 486
U.S. at 538 n.3. The plaintiff in Indian Towing sued the
government for failing to maintain a lighthouse in good working
order. The Court stated that the initial decision to undertake and
maintain lighthouse service was a discretionary judgment. SeeIndian Towing, 350 U.S. at 69. Thus, if the agency had instead
exercised its discretionary judgment to decline such an
undertaking, the government would be insulated from tort liability. 
This is analogous to OSHA's decision whether to undertake a wall-
to-wall inspection of the Somersworth Shoe plant. 
"The Court [in Indian Towing] held, however, that the
failure to maintain the lighthouse in good condition subjected the
Government to suit under the FTCA," because "[t]he latter course of
conduct did not involve any permissible exercise of policy
judgment." Berkovitz, 486 U.S. at 538 n.3. The failure by agency
employees to exercise ordinary care in carrying out an undertaking
that the government agency willingly undertook is not protected by
the discretionary function exception. This latter aspect of Indian
Towing is analogous to the OSHA inspections challenged in the
present case.
3
A third aspect of the Berkovitz decision further
undermines the majority's focus on the discretion permitted to be
exercised by the highest levels of OSHA. In Part III of its
opinion, the Court discussed the specific actions that the
Berkovitz plaintiffs challenged. The Court's mode of analyzing
each of the five possible claims illuminates how our court should
have examined the applicability of the discretionary function
exception.
The Division of Biologic Standards (DBS) of NIH had
issued a license to Lederle Laboratories to produce a drug called
Orimune. The plaintiffs alleged that DBS issued the license
without first receiving certain data that the manufacturer was
required to submit showing its compliance with regulatory safety
standards. The Court held that the discretionary function
exception did not bar a cause of action based on this allegation,
because the statute and regulations "require, as a precondition to
licensing, that the DBS receive" that data, and DBS had "no
discretion to issue a license without first receiving the required
test data." Berkovitz, 486 U.S. at 542. The actor in Berkovitzwas whatever level of the agency made the decision to issue the
license. Viewing the facts from that vantage point, there was "no
discretion . . . for the discretionary function exception to
protect" because of the statutory mandate.
The plaintiffs in Berkovitz also alleged that DBS
licensed Orimune without complying with other regulatory standards. 
The allegation was ambiguous and the Court explored three different
possible interpretations. Under a DBS regulation, DBS "may not
issue a license except upon an examination of the product and a
determination that the product complies with all regulatory
standards." Berkovitz, 486 U.S. at 544. Thus, if the plaintiffs
were "aver[ring] that the DBS licensed Orimune either without
determining whether the vaccine complied with regulatory standards
or after determining that the vaccine failed to comply, the
discretionary function exception does not bar the claim." Id. at
544. This is because "[t]he agency has no discretion to deviate"
from its "clear duty," i.e., from the procedures mandated by its own
regulations.
The Court applied a different analysis to the third
possible interpretation of the plaintiffs' claim: that the agency
found Orimune to comply with regulatory standards but that the
agency's conclusion was incorrect. This question "hinges on
whether the agency officials making that determination permissibly
exercise policy choice . . . in determining that a vaccine product
complies with the relevant safety standards." Id. at 545 (emphasis
added). Because the record was unclear on this point, the Court
remanded for appropriate findings by the district court. 
The Berkovitz plaintiffs made another allegation: that
DBS had approved the release of the particular lot of Orimune that
contained Kevan Berkovitz's dose, and the agency violated federal
policy in approving the release of that lot. The Court therefore
considered whether the discretionary function exception applied to
the release of a particular lot of the vaccine, as distinct from
the issuance of a license to produce the drug. The regulations
governing particular lots do not impose a duty on DSB to ensure
that the vaccines comply with regulatory standards, nor do they
require DSB to inspect every lot. Instead, "[t]he regulations
generally allow [DSB] to determine the appropriate manner in which
to regulate the release of vaccine lots, rather than mandating
certain kinds of agency action." Id. at 546. 
Given this regulatory context, the
discretionary function exception bars any
claims that challenge [DSB's] formulation of
policy as to the appropriate way in which to
regulate the release of vaccine lots. Cf.[Varig Airlines, 467 U.S.] at 819-20 (holding
that discretionary function exception barred
claim challenging FAA's decision to establish
a spot-checking program). In addition, if the
policies and programs formulated by [DSB]
allow room for implementing officials to make
independent policy judgments, the
discretionary function exception protects the
acts taken by those officials in the exercise
of this discretion. Cf. id. at 820 (holding
that discretionary function exception barred
claim that employees charged with executing
the FAA's spot-checking program made negligent
policy judgments respecting the proper
inspection of airplanes). The discretionary
function exception, however, does not apply if
the acts complained of do not involve the
permissible exercise of policy discretion. 
Thus, if [DSB's] policy leaves no room for an
official to exercise policy judgment in
performing a given act, or if the act simply
does not involve the exercise of such
judgment, the discretionary function exception
does not bar a claim that the act was
negligent or wrongful. Cf. Indian Towing v.
United States, 350 U.S. at 69 (holding that a
negligent failure to maintain a lighthouse in
good working order subjected the Government to
suit under the FTCA even though the initial
decision to undertake and maintain lighthouse
service was a discretionary policy judgment).

Berkovitz, 486 U.S. at 546-47 (emphasis added). 
This passage again makes clear the Court's view that, in
determining whether a particular (allegedly negligent) act is
exempt from the FTCA under the discretionary function exemption,
Berkovitz requires us to examine the particular government agent
who "performed [the] given act," and to determine whether particular
conduct is discretionary by looking at the "range of choice" the
agency has delegated to the particular employee in performing the
task in question.
The plaintiffs in Berkovitz had alleged that DBS had
adopted a policy of testing all vaccine lots
for compliance with safety standards and
preventing the distribution to the public of
any lots that fail to comply. [Plaintiffs]
further allege[d] that notwithstanding this
policy, which allegedly leaves no room for
implementing officials to exercise independent
policy judgment, employees of [DBS] knowingly
approved the release of a lot that did not
comply with safety standards. Thus,
[plaintiffs'] complaint is directed at a
governmental action that allegedly involved no
policy discretion.

Id. at 547 (citation omitted; emphasis added). 
The Berkovitz Court held that, "[i]f those allegations
are correct that is, if [DBS's] policy did not allow the official
who took the challenged action to release a noncomplying lot on the
basis of policy considerations the discretionary function
exception does not bar the claim." Id. It was therefore improper
to dismiss plaintiffs' claim regarding the release of the
particular lot of vaccines. See id. at 548.
The Berkovitz lot release allegations are analogous to
Irving's claim that the "implementing officials" at OSHA (the line-
level inspectors, Chase and Ritchie) were "le[ft] no room . . . to
exercise independent policy judgment" because their supervisors
mandated that they follow a particular inspection protocol. Id.at 547. Thus, as in Berkovitz, we must parse the distinction
between a regulatory agency's higher-level exercise of discretion
in determining agency policy and procedure which is exempt under
2680(a) and the implementation of that policy by the official
who took the challenged action which is exempt only if the
employee himself is given his own policy-based discretion to
"exercise independent policy judgment" in how to carry out his job. 
Id.
The staff employee's implementation conduct is not exempt
from the FTCA if the employee has no choice but to comply with a
higher-level mandate. And it makes no difference whether that
higher-level mandate comes from an agency regulation that adopts a
policy for all employees, saying they all must follow a particular
procedure in all particular situations, or whether the higher-level
mandate comes to the line-level employee from his or her immediate
supervisor as the manner in which to conduct his inspection of this
particular plant. The question is whether the individual
"employee's conduct can[] appropriately be the product of judgment
or choice" on his part; if not, then "there is no discretion in the
conduct for the discretionary function exception to protect." 
Berkovitz, at 536.
C
The Court's most recent FTCA discretionary function case,
United States v. Gaubert, 499 U.S. 315 (1991), is fully consistent
with this approach. The plaintiff in Gaubert challenged the
allegedly negligent manner in which federal bank regulators had
offered advice and made recommendations to a savings and loan
institution. He argued that "the discretionary function exception
protects only those acts of negligence which occur in the course of
establishing broad policies, rather than individual acts of
negligence which occur in the course of day-to-day activities." 
Id. at 334. The Court rejected the plaintiff's distinction between
policy-making and operational decisions, reaffirming Berkovitz's
focus on whether the actions of the particular government employee
"involv[ed] the necessary element of choice" that was grounded in
regulatory policy. Id. at 323. 
The Court offered the example of a federal official
negligently driving an automobile while on a mission connected with
his official duties, concluding that "the [discretionary function]
exception would not apply. Although driving requires the constant
exercise of discretion, the official's decisions in exercising that
discretion can hardly be said to be grounded in regulatory policy." 
Id. at 325 n.7. The exception is no more applicable to Irving's
case: even if the majority can somehow muster an argument that a
compliance inspector has discretion to refuse to follow his
supervisor's direct order about how thoroughly to inspect a
particular plant, any such discretion "can hardly be said to be
grounded in regulatory policy." Id. 
In contrast, the regulators' actions that Gaubert
challenged were within their range of policy-based discretion. 
They included replacing the bank's management; urging it to convert
to federal charter; intervening with a state regulatory agency;
advising the hiring of a financial consultant; advising when to
place a subsidiary into bankruptcy; advising on litigation policy;
and mediating salary disputes. These are not at all analogous to
Chase and Ritchie's negligent failure to inspect every machine in
the Somersworth Shoe plant, in contravention of the direct order of
their supervisor to do so.
D
Unlike the majority here, other circuits have followed
the Supreme Court's teachings in analyzing discretionary function
cases. For example, in Kennewick Irrigation Dist. v. United
States, 880 F.2d 1018, 1031-32 (9th Cir. 1989), the Ninth Circuit
held that a claim that the government negligently constructed a
canal was not barred because the "contracting officer's on-site
decisions" were not based on "policy judgments," and hence "were not
of the nature and quality that Congress intended to shield from
tort liability." In Phillips v. United States, 956 F.2d 1071 (11th
Cir. 1992), the Eleventh Circuit held that the exception was not
applicable to a claim that the Army Corps of Engineers failed to
exercise due care in carrying out mandatory safety obligations. In
Murdock v. Employer's Ins. of Wausau, 917 F.2d 1065 (8th Cir.
1990), the court held the exception did not preclude a claim that
the government failed to ensure that proper procedure was followed
in conducting excavation work. And in Cope v. Scott, 45 F.3d 445,
449 (D.C. Cir. 1995), the Third Circuit held that the exception did
not apply to the claim that the government had failed to post
adequate warning signs of dangerous road conditions.
III
It is true that the majority pays lip service to the
appropriate focus: "We recognize that, by its plain terms, the OSH
Act confers discretion only upon the Secretary, not upon compliance
officers and it is the latter's conduct that concerns us." Maj.
Op. at 18. But the majority then shifts its focus. It bases its
analysis not on the scope of discretion actually delegated to the
two inspectors whose conduct is challenged in the instant case, but
rather on regulations and manuals that generally grant OSHA
compliance officers broad discretion in the conduct of their
inspections. Id. at 18-19. 
The majority overstates the significance of the OSH Act
and the relevant guidelines. According to the majority, "the
statute and applicable regulations clearly speak to the nature of
the conduct" at issue in this case. But they do not. The statute
does not unambiguously permit inspectors to perform incomplete
inspections, nor does it clearly leave discretion to the individual
inspectors to decide just how comprehensive inspections must be,
regardless of direct instructions from their superior officers. 
Rather, the statute only confers jurisdiction on the Secretary to
perform inspections, and says nothing at all about how
comprehensive they must be. 
The majority finds it "[o]f particular importance" that
"the regulations do not prescribe any specific regimen governing
the scope or detail of general administrative inspections performed
by compliance officers." Id. at 19. But neither do the
regulations preclude all supervisors from exercising any
independent authority in managing the agency's work force. 
Regulations setting forth OSHA's general enforcement authority vis-
a-vis employers do not speak to the question of how the agency may
organize its staff into a hierarchy of managers, various levels of
supervisors, and line-level subordinate staff. As the Court stated
in Gaubert in an analogous situation, there is "no prohibition
against the use of supervisory mechanisms not specifically set
forth in statute or regulation." 499 U.S. at 330. The majority
cannot seriously read OSHA's general regulations, applicable
agency-wide, to transform OSHA supervisors into automatons who must
tell all subordinate inspectors nothing more than "go out and
exercise your own broad discretion."
Thus, the regulations cannot be read to deprive a
supervisor, in this case the area director, of all authority, in a
particular set of circumstances, to issue a specific instruction
mandating that a particular compliance officer take specific
actions when inspecting a particular factory (in this case,
instructions as to the degree of thoroughness of the inspection). 
Surely, a subordinate compliance officer cannot refuse such an
instruction on the theory that supervisory direction would violate
the broad discretion given to him or her in the regulations. A
subordinate employee does not have the "discretion" to disregard a
direct order from his supervisor merely because there is no
regulation or other "established governmental policy" that
specifically requires such action of all inspectors in all
circumstances. In the present case, it is enough that one
particular area director, Amirault, did prescribe certain
limitations on compliance inspectors Chase and Ritchie, with
respect to their inspections of the Somersworth Shoe factory.
The majority ignores Amirault's direct order because, it
asserts,"'wall-to-wall' inspections are no more than the general
administrative inspections described by the statute, regulations,
and guidelines." Maj. Op. at 25 n.10. Whatever may be true of the
ordinary case, the facts of this case are different and require a
different result. It is true that the general language of the
statute, regulations, and guidelines ordinarily permit inspectors
to exercise "the same broad discretion enjoyed by the Secretary
with respect to such inspections." Maj. Op. at 21. But in thiscase, area director Amirault ordered inspectors Chase and Ritchie
to do more than merely conduct a general administrative inspection;
he ordered them to "look at the entire plant." "As far as humanly
possible, [Chase and Ritchie] were supposed to cover the work
place" and "observe any place where the employee works," "look[ing]
at every operation" and "observing and documenting any violative
condition." These facts were found by the district court and its
factual findings are supported by record evidence and are not
clearly erroneous. See Part VI, infra.
Even the government recognizes that the district court's
finding that Chase and Ritchie were required, in their
"particular inspections," to "inspect every operational machine in
the plant" was "limited to the specific factual circumstances it
found existed during the time and area covered by Mr. Amirault's
testimony." Gov't Br. to Panel at 4-5 n.1. Indeed, such
limitation is the reason why the government decided not to "appeal
the court's finding regarding the application of the discretionary
function exception to this case." Id.
The proper inquiry therefore becomes whether Chase and
Ritchie in fact retained any policy-based discretion, in failing to
carry out Amirault's specific order to perform a wall-to-wall
inspection. The majority's sweeping discussion of overall OSHA
discretion in handling its inspections utterly fails to address
this inquiry, and it certainly contains no support for the kind of
affirmative response that would justify application of the
discretionary function exception. On the contrary, it is clear
from the facts as found by the district court that the answer to
the proper question is "no," and the exception is inapplicable. If,
as the district court found, inspectors Chase and Ritchie had no
such discretion, see Part VI, infra, then they had "no rightful
option" about what action to take, and therefore the discretionary
function exception does not apply, Berkovitz, 486 U.S. at 536.
The majority cites Gaubert for the proposition that
"informal agency rules and similar pronouncements may at times bind
agency personnel for the purposes of discretionary function
exception analysis." Maj. Op. at 22 (citing Gaubert, 499 U.S. at
324). This still focuses on generally applicable "pronouncements." 
What the majority fails to recognize is that a
supervisor's mandate to a subordinate agency official will "bind"
the subordinate in the conduct of his official duties, every bit as
much as "agency rules," formal or informal. Such a binding order
will preclude the subordinate from exercising discretion to any
extent other than that allowed within the supervisor's command. 
Thus, "for the purposes of discretionary function exception
analysis," courts should consult such individualized constraints "in
appropriate cases to determine whether a particular function is (or
is not) discretionary." Maj. Op. at 22.
In sum, the majority fails to follow the Court's guidance
on the most fundamental question. The majority focuses its
analysis on the discretion that OSHA and its command-level
employees enjoy to determine how it will enforce the Act, including
how thoroughly to inspect any given factory. The majority fails to
apply the Court's analysis which centers on the extent of
discretion exercised by the particular agency employee whose
actions are challenged by the plaintiff. This focus should prevail
at both steps of the Berkovitz analysis. 
Here, it is difficult to see any policy judgment in
negligently carrying out a commanded inspection or in flouting a
supervisor's direct order. But even if some such discretion did
exist, we still have to reach Berkovitz's step two, which asks
whether such discretion was based in political, social, or economic
policy, for Congress intended to "protect[] only governmental
actions and decisions based on considerations of public policy." 
Gaubert, 499 U.S. at 323 (quoting Berkovitz, 486 U.S. at 537). And
any discretion Chase and Ritchie might have enjoyed to negligently
carry out a commanded inspection "can hardly be said to be grounded
in regulatory policy." Id. at 325 n.7.
IV
In its attempt to apply the appropriate legal doctrine
here, the majority opinion repeatedly distorts Irving's theory of
the case, characterizing it as alleging "that OSHA had a policy of
exhaustively inspecting every machine," Maj. Op. at 28; "that OSHA
had a strict policy of requiring inspectors to look in detail at
every machine," id. at 31; "that all inspections ought to be
painstakingly comprehensive," id. at 34; "expect[ing] [OSHA
inspectors] to inspect every item in every plant," id.; and "zero
tolerance for any kind of risk," id. at 34 n. 13. The majority
then bravely shoots down this straw man. 
But it bears no relationship to Irving's theory of the
case. The conduct that Irving challenges is Chase and Ritchie's
failure to inspect every machine in the Somersworth Shoe factory
after receiving binding instructions from their supervisor to do
so. She does not argue that OSHA inspectors must "inspect every
item in every plant." Maj. Op. at 33-34. With respect only to the
Somersworth Shoe plant, Amirault had already weighed the competing
policy interests and concluded that this particular inspection must
be wall-to-wall, with every machine inspected and every violation
documented. Thus, the two inspectors who actually visited the
Somersworth plant had no choice about how extensively to inspect;
there was no room for them to exercise judgment or consider agency
policy concerns when it came to determining whether to skip any
machines; they had no discretion in the matter at all, whether
driven by policy or otherwise. They had orders and they were to
follow them. The fact that OSHA's upper management had a great
deal of discretion to choose various methods of enforcement in
deciding which plants around the country to inspect, whether to do
spot checks for some and wall-to-wall inspections for others, is
quite irrelevant from the point of view of the "Government agent[s]"
whose "acts" the Court told us to scrutinize in cases like this. 
Gaubert, 499 U.S. at 324; see Berkovitz, 486 U.S. at 536, 547. In
this rare case, those higher officials had already chosen to
exercise their discretion in a particular way, and their actions in
so deciding are not being challenged here.
The majority makes much of the fact that OSHA's resources
are limited and that OSHA must be permitted discretion to choose
how best to allocate such resources. But Irving does not challenge
OSHA's allocation of resources any more than she challenges OSHA's
enforcement policy in general or the decision to inspect one site
rather than another. Rather, she challenges only the thoroughness
with which the inspection was carried out after the decision had
been made to inspect this particular site in a particular way,
i.e., after the inspectors were specifically instructed to conduct
wall-to-wall inspections. The Eleventh Circuit's admonition is
also applicable to OSHA (and virtually all federal agencies): 
"Because resources are limited, it is axiomatic
that discretion must be used in allocating
available resources. . . . Nevertheless, this
does not mean that a federal employee's every
choice is a policy judgment shielded from
liability through the operation of the
discretionary function exception." 

Phillips, 956 F.2d at 1075.
The majority blurs the distinction, implicitly lumping
together Irving's claim with a theoretical challenge to high-level
agency resource-allocation decisions. This fundamental failure
carefully to parse her claim is contrary to the Supreme Court's own
detailed practice, as evidenced by Gaubert and Berkovitz, and it
infects the majority's entire analysis. See, e.g., Murdock, 917
F.2d at 1073 (carefully distinguishing between claims, barring
claim concerning decision as to what procedure should be used to
conduct excavation but not precluding claim as to government's
"failure to ensure that procedure was followed").
Moreover, as noted supra, while the Supreme Court has
rejected a rigid dichotomy between high-level and operational
decisions, see Gaubert, 499 U.S. at 326, the relative place of the
individual within the hierarchy does shed some light on the
question of whether that "acting employee's" conduct is of the kind
that Congress would have shielded. See id. at 335 (Scalia, J.,
concurring); Coumou v. United States, 114 F.3d 64, 65 (5th Cir.
1997) (recognizing some difference "between decisions at a planning
level, or decisions that exercise policy judgment, and decisions at
a[n] operational level, or decisions that are merely incident to
carrying out a government policy."). In particular, here, a line-
level inspector is not the kind of OSHA official who normally makes
policy judgments as to how the agency should deploy its scarce
resources. Nor is there any evidence in the record or other reason
to believe that Chase or Ritchie were in fact authorized to
exercise such discretion in connection with Somersworth Shoe.
Irving's claim, properly construed, is that, once
inspectors have been ordered to perform a wall-to-wall inspection,
they must do so with due care. Her claim does not implicate OSHA's
resource allocation discretion at all. Not only has the government
failed to identify a specific policy empowering on-site inspectors
to determine how thoroughly to conduct inspections, it has utterly
failed to provide any support for its naked assertion that such a
decision is actually "grounded" in any policy decisions. This case
simply does not involve second-guessing broad policy choices.
V
A number of other legal errors flaw the majority opinion.
A
The majority distorts Supreme Court precedent in the very
framing of its analysis. It states: "Under the jurisprudence of
the FTCA, a function is non-discretionary only when a 'federal
statute, regulation, or policy specifically prescribes a course of
action for an employee to follow.' Gaubert, 499 U.S. at 322
(quoting Berkovitz, 486 U.S. at 536)." Maj. Op. at 19-20 (emphasis
added). There is no basis in law for that position.
The word "only" does not appear in either Gaubert or
Berkovitz in connection with the quoted passage. The Supreme Court
has never required that a plaintiff show that the acting agent is
a bureaucratic automaton. Rather, it has repeatedly made clear
that "[t]he so-called discretionary function exception . . . does
not protect all governmental activities involving an element of
choice." Gaubert, 499 U.S. at 335 (Scalia, J., concurring) (citing
Berkovitz, 486 U.S. at 536-37). In the passage quoted by the
majority, the Court was merely explaining, by way of illustration,
that the government could not satisfy "the requirement of judgment
or choice" if a specific prescription existed in the statute,
regulation or policy. But the Court has never said that, absent
such a clear statement, embedded in formal law, a particular
function is therefore purely discretionary. Indeed, in Gaubert,
the Court essentially said the contrary: "[T]here was no
prohibition against the use of supervisory mechanisms not
specifically set forth in statute or regulation." 499 U.S. at 330;
see also id. at 326 ("[T]he distinction in Dalehite [v. United
States, 346 U.S. 15 (1953)] [between decisions made at a planning
rather than operational level] was merely description of the level
at which the challenged conduct occurred. There was no suggestion
that decisions made at an operational level could not also be based
on policy.").
Moreover, the Court plainly has never raised the
threshold on the first prong so high, as the majority does today,
as to make it virtually impossible to satisfy. To require a
plaintiff to show that the "acting employee" has no discretion at
all is tantamount to requiring the plaintiff to disprove the
government's entitlement to the exception, and expands the
discretionary function exception so much that it swallows the rule
of waiver of sovereign immunity. But these exceptions should be
read narrowly. As the Court stated in Kosak v. United States, 465
U.S. 848, 854 n.9 (1984):
Though . . . the exceptions to the Tort Claims
Act should not be read in a way that would
"nullif[y them] through judicial
interpretation," [citation omitted], unduly
generous interpretations of the exceptions run
the risk of defeating the central purpose of
the statute. See United States v. Yellow Cab
Co., 340 U.S. 543, 548 n. 5 (1951); cf. Blockv. Neal, 460 U.S. 289, 298 (1983) ("The
exemption of the sovereign from suit involves
hardship enough where consent has been
withheld. We are not to add to its rigor by
refinement of construction where consent has
been announced.") [internal quotation marks
omitted]. We think that the proper objective
of a court attempting to construe one of the
subsections of 28 U.S.C. 2680 is to identify
"those circumstances which are within the words
and reason of the exception" -- no less and no
more. See Dalehite v. United States, 346 U.S.
15, 31 (1953).

B
The second prong of Berkovitz's analysis of the
discretionary function exception whether the challenged inaction
"is of the kind that the . . . exception was designed to shield,"
i.e., grounded in policy is critical, for the exception, at its
heart, seeks to prevent second-guessing of governmental policy
decisions. True, "there is a presumption that 'the agent's acts
are grounded in policy,'" where an agency official is found to be
exercising discretion. Maj. Op. at 31-32 (quoting Gaubert, 499
U.S. at 324). But the majority fails to recognize that the
presumption is rebuttable. It may be overcome by evidence such as
Irving presented here, demonstrating that these particular
officials were not balancing competing policy concerns when they
failed to inspect the die-out machine during their inspection of
the Somersworth Shoe factory, after being instructed by their
supervisor to inspect every machine.
The majority erroneously treats the presumption as a
strong one, such that "the United States has no burden of
production; it may rest, as it did here, on the Gaubertpresumption." Maj. Op. at 32. The result of this front-loaded
approach is that the second prong will almost always be satisfied
once the first has been met. This approach is contrary to
Berkovitz and Gaubert, and also to the weight of authority in other
circuits that have properly acknowledged the overriding purpose of
the exception: to protect against impermissible second-guessing of
express policy judgments.
It is admittedly difficult to determine whether a
decision or task is based on political, social or economic policy,
for "nearly every government action is, at least to some extent,
subject to 'policy analysis.'" Cope, 45 F.3d at 448. The
majority's approach permits decisions by low-level employees
involving the faintest hint of choice to fall within the exception. 
But as courts have repeatedly warned, such a front-loaded approach
"would not only eviscerate the second step of the analysis set out
in Berkovitz and Gaubert, but it would allow the exception to
swallow the FTCA's sweeping waiver of sovereign immunity." Cope,
45 F.3d at 449 (holding that exception did not apply to claim that
government failed to post adequate warning signs of dangerous road
conditions); see also Duke v. Department of Agric., 131 F.3d 1407,
1411 (10th Cir. 1997) (agreeing with D.C. Circuit that applying
exception to governmental decision involving a "hint of policy
concern" eviscerates the second prong of Berkovitz). 
A somewhat analogous situation may be seen in the cases
involving a failure to warn of a danger to health or safety. In
such situations, the actor who failed to warn is similar to
inspectors Chase and Ritchie here: if the acting employee had
warned of the danger, the plaintiff would not have been injured. 
And, similarly, the failure to warn was not based on balancing
competing policy interests. Some courts have consistently held
that "a failure to warn involves considerations of safety, not
public policy" and that except for the rare case where failure to
warn implicates "broad, policy-making activities" the discretionary
function exception is inapplicable in failure to warn cases. Faberv. United States, 56 F.3d 1122, 1125 (9th Cir. 1995); see also Boydv. United States, 881 F.2d 895, 898 (10th Cir. 1989) (failure to
warn swimmers of dangerous conditions "does not implicate any
social, economic, or social policy judgments with which the
discretionary function exception properly is concerned.");
Andrulonis v. United States, 952 F.2d 652 (2d Cir. 1991) (high-
ranking official's alleged failure to warn of hazards associated
with rabies vaccine not barred by exception).
C
The majority's analysis seems to reinstate the
"regulatory function exception" which the government urged upon the
Court in Berkovitz but which the Court explicitly rejected. SeeBerkovitz, 486 U.S. at 538-39. Without any basis in the Act, the
government had proposed that the Court transform the discretionary
function exception into a "regulatory function exception" that would
apply 2680(a) to "preclude[] [government] liability for any and
all acts arising out of the regulatory programs of federal
agencies." Id. at 538. The government had argued that regulatory
programs by their nature entail agency discretion at the highest
levels to weigh various competing policy interests. Based on the
statute's plain language and the legislative history, the Court
"put the Government's argument to rest," id. at 539, concluding that
"Congress intended the discretionary function exception to apply to
the discretionary acts of regulators, rather than to all regulatory
acts," id. at 539 n.4. 
The majority's decision today resurrects the government's
discredited "regulatory function" theory. Because the larger agency
(OSHA) has broad discretion over its enforcement authority (as all
regulatory agencies clearly will), the majority's approach would
exempt from tort liability virtually all actions taken by employees
of regulatory agencies, without looking at whether the acting
employee, whose conduct is the basis of the suit, actually had "no
rightful option but to adhere to [a] directive" from his
supervisor. Berkovitz, 486 U.S. at 536.
VI
In addition to its erroneous interpretation of Supreme
Court precedent, the majority inexplicably fails to adhere to the
well-established "clearly erroneous" standard of review for district
court findings of fact. See Fed. R. Civ. P. 52(a); Anderson v.
Bessemer City, 470 U.S. 564, 573-74 (1985). 
The district court found the following facts: (i) in
1975 and 1978, the OSHA compliance officers each had been directed
to perform a "wall-to-wall" safety inspection of the Somersworth
plant; (ii) although the OSH Act and OSHA regulations leave many
decisions regarding the conduct of workplace inspections to the
discretion of the area director and compliance officers, the scope
of the inspections of the Somersworth plant that the compliance
officers were instructed to perform in 1975 and 1978 "was dictated
by less formal, but no less binding, OSHA policy," requiring the
officers to "inspect every operational machine and work station in
the plant," and to record every violation of OSHA safety standards
that they observed be they de minimis, non-serious, or serious
if there was potential employee exposure to the violative
condition; (iii) the die-out motor drive shaft was not guarded by
location at the time of the accident; (iv) at the time of the
accident, the die-out machine was in materially the same condition,
and was at or near the place it had been located during the 1975
and 1978 inspections, and, therefore, the drive shaft had not been
guarded by location at the time of these inspections; (v) the die-
out machine was in near-continuous operation during the relevant
time period, and was in operation during both inspections; (vi)
operation of the die-out machine while the drive shaft remained
unguarded was in flagrant violation of OSHA safety standards; (vii)
during the 1975 and 1978 inspections, the compliance officers
failed to document, and OSHA failed to cite, the violative
condition of the drive shaft; (viii) had the compliance officers
actually inspected the bench assembly, they would have noticed and
documented the violative condition of the drive shaft. 942 F.
Supp. at 1492-1502.
The district court concluded from the evidence that the
record would not support a finding that OSHA compliance officers
Chase and Ritchie both of whom the court found to be experienced
workplace safety inspectors who took their jobs seriously were
so utterly incompetent as to have inspected the bench assembly but
failed to notice the unguarded condition of the drive shaft and to
recognize it as a violation of OSHA standards. Instead, the
preponderance of the evidence "decidedly supports the conclusion
that both Chase and Ritchie would have recognized that the bench
assembly violated OSHA safety standards requiring the guarding of
power transmissions if they had, in fact, inspected it," and that
the only realistic explanation for their failure to notice and
document the unguarded drive shaft was that neither officer
actually inspected the bench assembly during his inspection of the
Somersworth plant. 942 F. Supp. at 1497 (emphasis added). The
district court thus determined that the challenged conduct, and the
basis for Irving's state-law cause of action and FTCA claim, was
the failure of the compliance officers to inspect every operational
machine in the Somersworth plant in 1975 and 1978, as they were
required to do by mandatory OSHA policy, and their negligent
performance of their task. Id. "[T]hey were under a mandatory duty
to inspect every operational machine and failed to do so." Id. at
1502.
The majority never analyzes the district court's findings
of fact under the proper standard of review: whether they were
clearly erroneous. See Fed. R. Civ. P. 52(a). In particular, the
majority fails to accord appropriate deference to the district
court's findings, as the "clearly erroneous" standard requires. SeeAnderson, 470 U.S. at 573-74 (explaining that the same deference is
required to district court's "inferences drawn from other facts");
Johnson v. Watts Regulator Co., 63 F.3d 1129, 1138 (1st Cir. 1995)
("[A]n appellate court must refrain from any temptation to retry
the factual issues anew.").
Instead, the majority examines the evidence for itself
and second-guesses the district court's findings, making its own
findings of fact. That would be fine, if this court were the trial
court. But the district court heard the evidence and reached a
contrary set of factual determinations. This court has no basis
for disturbing those findings. Arthur D. Little, Inc. v. Dooyang
Corp., 147 F.3d 47, 54 (1st Cir. 1998) (Where the "district court's
findings of fact are not clearly erroneous," the appellate court
"will not disturb them.").
The district court's findings are plainly supported by
the record in this case; at the very least, they are not so lacking
in support as to be clearly erroneous. Nothing in the record
indicates that Amirault ordered inspections in 1975 and 1978 that
were anything other than wall-to-wall inspections, or that the OSHA
compliance officers were at liberty to choose to conduct a spot-
check inspection of only some, not all, machines or areas within
the plant. In all events, the government does not now dispute that
the compliance officers in 1975 and 1978 were obliged to conduct
wall-to-wall safety inspections; indeed, the government's attorney
conceded at oral argument before the district court that "[i]f
there's a requirement to look at every machine and he does not look
at every machine, then I would agree that that's a violation of a
mandatory regulation." 942 F. Supp. at 1499 n.19.
Moreover, the means by which the majority carries out its
own fact-finding mischaracterizes the trial testimony. An example
appears in the majority opinion at 31. The majority quotes a
series of questions and answers and then summarizes them as
follows: "Read naturally, this passage indicates that general
administrative inspections constitute nothing more than 'walk
throughs' that involve random spot checks." This summary is not at
all accurate. The "natural" reading of Amirault's testimony is not
that the inspector, once inside the plant, would "spot check" only
some machines; rather, OSHA's "random way of just doing spot checks
on an entire plant without advance notice," maj. op. at 30, more
likely meant that OSHA chose at random which plant to inspect. 
Regarding the Somersworth inspections in particular, Amirault
testified that, once inside the plant, the inspector was to conduct
"a wall-to-wall inspection," spending "whatever time was necessary
to inspect the entire plant for safety hazards," id. at 31
(emphasis added), "machine by machine by machine," Irving, 942 F.
Supp. at 1491 n.8. If the majority's "spot-check" finding of fact
were made by a district court, an appellate tribunal would be
compelled to strike it as clearly erroneous. The district court's
findings to the contrary were plainly correct, and surely pass
muster under the clearly erroneous standard of review.
In discussing the ordinary procedures for conducting
inspections, the majority notes that "OSHA compliance officers are
expected to study the layout of the facility they are about to
investigate, to review its health and safety records, and to
interview employer and employee representatives during the
inspection about working conditions. One might expect that as a
result of such study, OSHA inspectors will make daily judgments
about what risks and safety issues most urgently require their
attention." Maj. Op. at 33. But again, the question is not what
the majority of this court "expects" might occur during an ordinary
OSHA inspection, but what actually appears in the record of this
case. As the district court found, here, OSHA, through its area
director, in fact undertook a wall-to-wall inspection of the
Somersworth Shoe plant. Chase and Ritchie were ordered to carry
out that undertaking, not to decide for themselves "what risks and
safety issues most urgently require their attention." Whatever
"daily judgments" they might, in other circumstances, have been
authorized to make about such issues were inapplicable here. Chase
and Ritchie had no choice in these particular inspections but to
comply with the mandate from their superior.
CONCLUSION
The majority decides today that the government is immune
from suit for the inspectors' negligence, based on the
discretionary function exception to the Federal Tort Claims Act
(FTCA). 28 U.S.C. 2680(a). It rewards the agency when it
undertakes to conduct a comprehensive safety inspection and then
does so carelessly. And when the record is devoid of any evidence
to suggest why incomplete "wall-to-wall" inspections or shoddy
inspections could possibly be grounded in policy, the majority
creates its justifications out of whole cloth. Such a decision
violates the letter and spirit of the FTCA and flies in the face of
controlling Supreme Court precedent on the subject.
I have great regard for my colleagues on this court. But
however able they may be, they do not have the authority to refuse
to follow a binding precedent from the Supreme Court of the United
States. The Court's early treatment of the discretionary function
exception may have been inconsistent or unclear as to how to apply
the exception. But the decision in Berkovitz clarified the
analysis courts must employ in such cases. Berkovitz also
harmonized prior precedents and, as I have shown, Gaubert is
likewise in harmony with the Berkovitz approach.
Unfortunately, the majority today totally misapplies the
Court's rulings, indeed eschewing any analysis of Berkovitzwhatsoever. The majority instead states its own priorities: "Even
if [a government] decision may seem wrong in retrospect, or if its
implementation is negligent, such decisionmaking by its nature
typically requires a balancing of interests (e.g., how to deploy
scarce government resources in the accomplishment of worthwhile 
but expensive public needs). Congress reasonably struck this
balance by requiring that, ordinarily, liability will not inhere
absent an authoritative decision that a specific act should become
a governmental responsibility." Maj. Op. at 35. 
This does not state the applicable law according to the
Supreme Court. Nowhere does the Court require "an authoritative
decision that a specific act should become a governmental
responsibility" before an injured party may sue in tort. On the
contrary, the FTCA broadly waives sovereign immunity unless the
government establishes that the employee performing the challenged
act not his supervisor acted within authorized discretion that
was based in policy. If other members of this court are unhappy
with the FTCA as it has been authoritatively interpreted by the
Supreme Court, they cannot simply ignore the Court's interpretation
of Congressional intent. Unless Congress amends the statute or the
Court modifies its construction, this court must faithfully apply
the Court's teachings. See Wessmann v. Gittens, F.3d , ,
1998 WL 792148, at *21 (1st Cir. 1998) ("[U]nless and until the
Justices reconfigure their present doctrine, it is the job of
judges in courts such as this to respect the letter and spirit of
the Supreme Court's pronouncements.").
The majority's mischaracterization of plaintiff's
position further undermines its conclusion. In short, the majority
does today what the Supreme Court has specifically warned against:
it has acted "as a self-constituted guardian of the Treasury
import[ing] immunity back into a statute designed to limit it." 
Indian Towing, 350 U.S. at 69.
I respectfully dissent.